**INDIANAPOLIS WATER CO. v. McCART et al.**

No. 5819.

Circuit Court of Appeals, Seventh Circuit.

March 23, 1937.

Rehearing Denied May 10, 1937.

William L. Ransom, of New York City, and Joseph J. Daniels and G. R. Redding, both of Indianapolis, Ind. (Baker & Daniels, of Indianapolis, Ind., of counsel), for appellant.

Philip Lutz, Jr., Atty. Gen., Urban C. Stover, First Deputy Atty. Gen., and James E. Deery, Corp. Counsel, and Floyd J. Mattice, City Atty., both of Indianapolis, Ind. (Edward H. Knight, of Indianapolis, Ind., of counsel), for appellees.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

The Indianapolis Water Company, a public service corporation, supplying the city of Indianapolis, Ind., and its citizens with water, filed its amended and supplemental bill in the District Court on December 31, 1932, alleging as confiscatory a certain schedule of water rates promulgated by the Public Service Commission of Indiana on December 30, 1932—effective January 1, 1933. The matter was referred to a special master, who, after an extended hearing, filed his report on May 18, 1934, fixing the value of all of plaintiff's property, used and useful, at $20,282,143. He found a reasonable rate of return to be 6 per cent. and that the rates fixed by the commission would produce $1,294,566.51, or slightly in excess of 6 per cent. Upon exceptions the District Court, on November 29, 1935, varied the findings of the special master in three important particulars by (1) excluding from the property of the company to be considered in the determination of value a tract of some 4,854 acres of land known as the "Oaklandon" project, (2) increasing the value to be given certain water rights from $358,605 fixed by the master to $500,000, and (3) by increasing the item of cost of common labor entering into reproduction costs by $1,333,333. These changes moved the court to fix an aggregate value on the company's property of $21,392,821. In all other respects the report of the special master was approved, and the changes noted in the court's findings did not cause it to reach a different ultimate conclusion than that reached by the master, to wit, that the promulgated rates were adequate and not confiscatory. From this conclusion, expressed in a decree, the company appeals assigning many errors.

The Public Service Commission had, at the conclusion of its investigations in 1932, fixed the aggregate value of the company's property used and useful in the furnishing of water service at $22,500,000 and had authorized and directed the placing in effect on January 1, 1933, the following schedule of rates:

| | | | | |
|---|---|---|---|---|
| First | 500 | cubic feet | | $0.25 |
| Next | 1500 | " | " | .18 |
| Next | 2500 | " | " | .16 |
| Next | 7500 | " | " | .14 |
| Next | 18000 | " | " | .12 |
| Next | 20000 | " | " | .10 |
| Next | 50000 | " | " | .08 |
| Over | 100000 | " | " | .06 |

Monthly minimum charge per meter:

| | |
|---|---|
| 5/8 inch meter | $1.25 |
| 3/4 " " | 3.00 |
| 1 " " | 4.50 |
| 1½ " " | 7.00 |
| 2 " " | 11.00 |
| 3 " " | 20.00 |
| 4 " " | 30.00 |
| 6 " " | 50.00 |

Public fire protection service:—

| | |
|---|---|
| Annual charge per hydrant | $12.00 |
| Annual charge per inch foot | .0111 |

The commission said in its report at that time that such rates would, "according to estimates furnished by its accounting department," produce a gross income of $1,335,000 (slightly less than 6 per cent.), but expressed the opinion that such rates would produce a gross income of $1,400,000 (slightly more than 6 per cent.). The commission also said in such report that such schedule of rates "may not yield a fair rate of return" upon what was then indicated as the fair value of the company's property, "but the value found for the property has not and should not be pared down to fit the rates and revenues. The rates * * * are based upon all the evidence and conditions, particularly the prevailing economic depression. The Commission is of the opinion that with a return of normal business conditions, the rates now fixed will prove sufficient and compensatory, in any event, under the prevalent conditions, the rates established are all the Commission feels warranted in authorizing at this time, and any further recoupment of the Company's losses in revenues will have to come through regained volume of business rather than through rates higher in themselves."

The commission in its verified answer, filed in this proceeding, averred that the valuation of the company's property, as found by it, was substantially correct, but later by amendment said that the value did not exceed the sum fixed by it ($22,-500,000) and offered evidence indicating a less value.

We have given consideration to the many assignments of error urged upon us, and will refer briefly to the more important ones.

### Oaklandon Project.

Assignment of error No. 19 challenges the correctness of the holding of the District Court in excluding from consideration as nonused and nonuseful certain property of appellant known as the Oaklandon lands. The commission had included this in the rate base as had the master who fixed its fair value at $364,050. The court agreed with the master as to its fair value, but felt that under the circumstances it should not be included.

These lands consisted of 4,854 acres located along and upon both sides of Fall creek, beginning at a point some 15 miles northeast of Indianapolis, and were acquired over a period of 4 or 5 years preceding the time of the hearing with the authority of the commission and for the purpose of establishing a reservoir for future water needs. It was the purpose at the time of the purchase to construct a dam near the lower boundary line of such tract and retard the flow of water in Fall creek and thus build a large reservoir. Appellant's engineer tesified that preliminary studies had been made with respect to the proposed dam and reservoir and detailed plans completed. It seems that the advent of the depression retarded the consumption of water, and this factor and others caused a slowing of the project. An examination of the evidence on this subject offers no justification for an assumption that the project has been abandoned. On the other hand, it requires a finding that the property was providently purchased and in good faith and is reasonably useful for appellant's business. Under such circumstances it should have been included in the rate base. Brooklyn Borough Gas Co. v. Prendergast (D.C.) 16 F.(2d) 615, and cases cited. The time when and the precise manner in which it shall be brought into active use is for its owners to determine. Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; Banton v. Belt Line Ry. Corp., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020; State Public Utilities Commission v. Springfield Gas & Electric Company, 291

Ill. 209, 125 N.E. 891. If there comes a time when it appears no longer to be useful and not reasonably to be required for the future operations of the company or the needs and health of the community, it may be excluded. The evidence does not justify the conclusion that this time has yet arrived. The valuation fixed upon this land, of $364,050, by the court finds ample support in the evidence and should have been included in the valuation of appellant's property.

### Undistributed Construction Costs and Going Value.

In assignment of error No. 18 appellant asserts that, while the court increased the special master's valuation of water rights and common labor costs in the aggregate amount of $1,474,728, it failed to reflect such increased values in its determination of "undistributed construction costs" and "going value." These two latter elements are concededly proper factors to be given consideration in an appraisement of appellant's property. See Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 35 S.Ct. 811, 59 L.Ed. 1244; Denver v. Denver Union Water Co., 246 U.S. 178, 38 S.Ct. 278, 62 L.Ed. 649; McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 151, 71 L.Ed. 316; Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L. Ed. 1180. In the instant case they were arrived at by both the master and court on a percentage basis. The agreed inventory, seemingly used by all the parties, had grouped the various items entering into the total property, as follows:

Item 1. Organization expenses.
Item 1A. Water rights.
Item 2. Land (exclusive of improvements).
Item 3. Buildings, fixtures and grounds.
Item 4. Pumping equipment.
Item 5. Intakes and supply mains.
Item 6. Purification system.
Item 7. Distribution system.
Item 8. General equipment.
Item 9. Working capital.
Undistributed construction costs.
Going value.

In the determination of undistributed construction costs the four engineering witnesses had arrived at four separate figures which, when translated into percentages, computed upon items 1 to 8, inclusive, were as follows: Fuller 17.1 per cent., Pirnie 15.5 per cent., Wenger 14.9 per cent., Hansen 14.8 per cent. The master concluded that an allowance of 15 per cent. upon the depreciated value of such items 1 to 8, inclusive, was a fair allowance for undistributed construction costs, and with this the court agreed, but failed to extend such percentage computation to the added value above indicated of $1,474,728. The question is not whether a fixed percentage of items 1 to 8, inclusive, would have been a proper basis in itself for the determination of undistributed construction costs, as it appears that all of the experts who testified used a more scientific basis to arrive at their figures; but this was only the machinery adopted by the master and court for interpreting their conclusions. Having adopted such means, it was necessary, in order to follow through on this basis, to apply same to the increased value given to such items. This would have been in harmony with the evidence, and would have been a correct application of the expert testimony.

The same is true of the item of going value where the master and court adopted as a proper valuation 9½ per cent. of items 1 to 9, inclusive, but the court failed to give effect to this in the added value placed on the property by it. These two discrepancies, if corrected on the basis of the court's valuations, would add an additional value of $361,308.

It is also contended that the percentage applied, in order to ascertain "going value," should likewise have been extended to whatever sum was found to fairly represent undistributed construction costs, as well as items 1 to 9 aforesaid. This we think fair and more nearly responsive to the evidence upon the subject. This correction on the basis of the court's findings of value of undistributed construction costs (plus the correction hereinbefore indicated) would add to the item of going value the sum of $250,079.

### Effect of Rising Trend in Prices.

It is to be noted that the testimony before the master as well as the findings of the master and court with reference to value were directed to April 1, 1933. The court, however, recognizing what we deem to be a correct principle, found that the sum of $21,392,821 was not only a fair and reasonable value on that date but "was the fair and reasonable value thereof as of the time of filing the report of the Special Master (May 18, 1934), and as of the date of these findings (Nov. 29, 1935) and that such value will continue

to be a fair and reasonable value of the Plaintiff's used and useful property for a reasonable time in the future."

Assignments of error 16 and 17 deal with what appellant asserts was the failure of the court to give any effect to the definite increase and upward trend of values from April 1, 1933, to the date of the final decree (November 29, 1935). The master had found (which finding had been approved by the court) that "there was no indication on April 1, 1933, nor has there been at any time since, that there would be any definite trend, either upward or downward, for a reasonable time in the future, as to prices or values of any of the items of property owned by plaintiff."

From the date as of which the valuations were fixed (April 1, 1933) to the date of the court's decree (November 29, 1935), 32 months had intervened. For one to say on April 1, 1933, what the trend of values was to be for the next ensuing 32 months was prophecy, but on November 29, 1935, we had, at least for this period, definitely passed from the field of speculation to one of experience. Experience had taught that for those 32 months there had been a constant and definite trend upward in commodity values. The "Engineering News Record," referred to by the parties as a reasonably reliable guide as to price trends, furnishes the following index figures for a 5-year period: 1931—181.35; 1932—156.97; 1933—170.18; 1934—198.10; 1935—195.22. The "All Commodities Index of the United States Department of Labor" tells the same graphic story of the rise of prices during the same period but somewhat less conservatively than above noted. We think, therefore, that the court's findings in this respect were contrary to facts that we must judicially know and must recognize in determining a fair valuation of appellant's property.

It is recognized that values as applied to utility properties experience marked fluctuations from time to time. The purpose to be achieved in a determination of value is to give recognition to any increase or decrease in values at the time under consideration in order to reach a fair valuation not only for the moment but for the reasonably near future. A redetermination of values and rates cannot be had at frequent intervals, and consequently a determination that gives full recognition to the immediate future years is to be sought. This will largely be prophecy,

unless facts are at hand that are more convincing than prophecy. We think in this instance facts were at hand that overrode the prophecy. This principle was given recognition in McCardle v. Indianapolis Water Co., supra; Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, supra; West Ohio Gas Company v. Public Utilities Commission, 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773; West v. Chesapeake & Potomac Telephone Company, 295 U.S. 662, 55 S.Ct. 894, 898, 79 L.Ed. 1640. In the case of West v. Chesapeake & Potomac Telephone Company, supra, decided June, 1935, the Supreme Court, in rejecting a valuation by the Maryland commission, said: "As shown by the commission's exhibits, the price trend was gradually ascending from 1923 to 1929. It then suffered a precipitate decline so that at December, 1932, the date of the commission's valuation, it was at the nadir. Since then it has made a sharp recovery. The commission recognized this. Its report and order were made November 28, 1933. At that time the price level, as shown by the all-commodities index of the United States Department of Labor, had arisen 13.1 per cent. over that of December 31, 1932. * * * What the commission in effect did was to take the temporary low level of December, 1932, and apply this low level for the indefinite future in ascertaining the so-called fair value of the company's plant and property. The experience of the two years which have elapsed since the commission's order clearly indicates the impropriety of the use of its method in the appraisal of a property such as that of this company." We have quoted at length from the court's opinion on account of the similarity of dates and the similarity of the point before the court with that now under consideration. The appraisal by the commission in the instant case was in the fall of 1932, termed the "nadir" of the depression; the subsequent fixing of values by the master was as of April 1, 1933, with a finding that there was no indication at that time, or since, that there would be a definite trend "either upward or downward" in prices and values. We now find that there was a definite rise in commodity prices of approximately 25 per cent. during the 32-month period referred to which was bound to be reflected in the appraisement of appellant's property. We think under the authorities referred to this gen-

eral and persistent rise in prices should have been given effect in fixing a fair valuation.

But appellees say, "How about appellant's income? Did it follow the price index and increase? * * * If good times bring high prices, they also bring increased revenues which would offset any assumed rise in values." This by no means follows. The rate of course remains stationary and unaffected, and any increase in revenues due to a general appreciation of values could only be effected by an increased use of the commodity. In the case of the ordinary merchant it would be hoped that the suggested formula would apply—and even in the case of some utilities, notably electric current, with its remarkable increase in consumption in recent years, an increase in revenue in step with advancing values might more reasonably be expected; but in the case of a company selling water this would not be marked and could in no event be in any substantial ratio to the rise in prices generally.

### Rate of Return.

█ The unprecedented depression which has engulfed our country in recent years and which has amounted to an economic upheaval of worldwide magnitude, has injected into the question of what is an adequate return questions not ordinarily present. When the question of an adequate rate for this identical utility was before the Supreme Court in 1926 (McCardle v. Indianapolis Water Co., supra), the court, in approving a return of 7 per cent., said: "It is obvious that rates of yield on investments in bonds plus brokerage is substantially less than the rate of return required to constitute just compensation for the use of properties in the public service. Bonds rarely constitute the source of all the money required to finance public utilities. And investors insist on higher yields on stock than current rates of interest on bonds. Obviously, the cost of money to finance the whole enterprise is not measured by interest rates plus brokerage on bonds floated for only a part of the investment. The evidence is more than sufficient to sustain the rate of 7 per cent. found by the commission. And recent decisions support a higher rate of return."

In the recent case of West v. Chesapeake & P. Tel. Co., supra, the commission had thought that a rate of 6 per cent. was a proper return, and the District Court had held that 6 per cent. was the limit beyond which the return could not be reduced without confiscation. In affirming the decree of the District Court enjoining the commission, the Supreme Court declined to discuss the rate of return.

Witnesses Dickson and Hill thought a return of 8 per cent. would be required by the company; witnesses Miller and Hansen believed that 6 per cent. was an adequate return; and the witness Payne was of the opinion that a return somewhere between 5 and 6 per cent. was adequate. The master found that 6 per cent. would be adequate under efficient and economical management to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. With this finding the District Court agreed, and we think such conclusion finds ample support in the evidence.

The previous expression of the Supreme Court, indicating approval of a return of 7 per cent., is to be weighed by the conditions then confronting the court (1926), and we have given it the consideration that we respectfully feel it entitled as viewed at this date and under present conditions. We agree with the District Court that 6 per cent. was adequate under existing conditions.

### Net Income Applicable to Return.

█ A dispute has also arisen with reference to the income properly applicable to return. The master found that income applicable to return for the year 1933 and for a reasonable time thereafter would be $1,294,566.51, which was some $57,000 higher than the testimony of any witness indicated. The witness Williams, chief accountant for the commission, estimated that the net income applicable to return for the year 1933 would be $1,237,294. Witness Hill for the company found the figure to be $1,206,257. It is unnecessary to detail the master's process of reasoning by which he arrived at his figure, but it is not without merit. We would, however, feel obliged to strike it down as being without substantial support in the evidence were it not for the fact that he had, before making his report (May 18, 1934), given the company the opportunity of again presenting evidence of the actual operating receipts and disbursements for the calendar year of 1933, and, upon consideration, its counsel declined to offer

further proof. The question of what the net income had been for the year, 1933, under the new schedule of rates, was not at that time any longer a matter of estimates but had become an established fact and the facts were in the possession of the company. Prophecy was then entitled to give way to experience and under such circumstances, if the company chose to remain silent with the facts in its possession, it is in no position to complain. We therefore accept the figures as found by the master and approved by the court.

The correction of the errors hereinbefore specifically referred to, without reference to the failure to give effect to the rise of values generally, would produce a return of less than 6 per cent. It is unnecessary for us to undertake an application of the upward trend of prices since April 1, 1933, to the specific items of appellant's inventory or to say in what amount a proper consideration of same would enhance the value to be given appellant's property. Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182. It is sufficient to observe that it would be so substantial as to make the questioned rates clearly confiscatory. Narrowly stated, our function is to ascertain whether an application of the proposed rates would amount to a confiscation of appellant's property in violation of the Fourteenth Amendment. We conclude that it would. The decree of the District Court is reversed and the cause remanded, with directions for further proceedings in accordance with the views expressed in the opinion of this court.

Reversed and remanded.