## BALTIMORE GAS AND ELECTRIC COMPANY
### *v.* McQUAID ET AL.

[No. 21 (Adv.), September Term, 1959.]

374

*Decided June 29, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Alfred P. Ramsey* and *William B. Rafferty,* with whom was *Clarence W. Miles* on the brief, for appellant.

*Wilfred T. McQuaid, People's Counsel,* with whom were *Hugo A. Ricciuti, City Solicitor,* and *F. Clifford Hane, Deputy City Solicitor,* on the brief, for Wilfred T. McQuaid and Mayor and City Council of Baltimore, part of the appellees.

*Donegan Mann, Attorney, General Services Administration,* with whom were *J. H. Macomber, Jr., General Counsel, General Services Administration, George Cochran Doub, Assistant Attorney General, Samuel D. Slade* and *John G. Laughlin, Attorneys, Department of Justice,* and *Leon H. A. Pierson, U. S. Attorney,* on the brief, for United States of America, other appellee.

HAMMOND, J., delivered the opinion of the Court.

The Baltimore Gas and Electric Company, on January 15, 1958, filed with the Public Service Commission proposed revision of its electric, gas and steam service tariffs designed to increase gas and electric revenues each by 6½%, and steam revenues by 10%, estimated by the Company to produce net operating income of $4,683,000 (an actual return of 6.33% in the case of electricity, 6.07% in the case of gas, and 4.52% in the case of steam) or an overall return of 6.25%. The Com-

mission suspended the proposed increases, as it is authorized to do by Code (1957), Art. 78, Sec. 70, and after an extensive hearing, entered an order on July 11, 1958, authorizing a maximum return of 6.25% which was calculated to actually produce net operating income of $4,442,000 (a return of 6.25% in the case of electricity, 6.07% in the case of gas, and 4.52% in the case of steam), or an overall return of 6.20%. The Commission found that the fair value of the Company's property (in round figures) used and useful in the public service was $423,855,000, arrived at by adding to $391,655,000, the rate base as of December 31, 1957, the sum of $32,200,000, which the Commission found would be the value of net additions to plant in 1958.

The People's Counsel and Baltimore City appealed to the Circuit Court No. 2, and Baltimore County and the General Services Administration of the Federal Government intervened (all four had opposed the increases sought before the Commission). The trial judge held that the statute authorized the Commission to include in the rate base only property in actual use at the time of the filing of the inquiry; and, therefore, the inclusion of prospective capital additions was erroneous as a matter of law, even though the testimony before the Commission had indicated that the nature and amount of the additions were known, and their use imminent.

tion of the Commission of July 11, 1958, "to the extent that
On April 1, 1959, the lower court ordered: 1. that the ac-
it allows the defendant, Baltimore Gas and Electric Company
the sum of $32,200,000 of projected plant in its Rate Base", be vacated; 2. that the Commission be enjoined permanently from fixing the fair value of the property of the Company for rate making purposes in this proceeding in excess of $391,-673,457 (its value as of December 31, 1957) ; 3. that the Company be enjoined from collecting any rates predicated upon "the illegal inclusion in its Rate Base of the aforesaid $32,-200,000"; 4. that the Company refund to its customers all monies collected which represent rates for services predicated upon "the illegal inclusion in its Rate Base of the said $32,-200,000" (some $2,000,000). The appeal is by the Company from that order.

The testimony before the Commission permitted, almost compelled, findings that the cost of the Company's services has remained virtually unchanged since 1930 despite the halving of the purchasing power of the dollar, the trebling of the Company's wage rates and the doubling of its taxes per dollar of revenue, that the rates set by the Commission have failed during the twelve post-war years to produce the anticipated rate of return, and in nine of these years, if a year end rate base is used, and in six of these years, if an average rate base is used, the minimum return authorized has not been earned. Using year end rate bases, the unrecoverable revenue deficiencies below the allowed maximums amounted to $19,700,000 and below the allowed minimums, $6,200,000, even though during the same period the Company had increased its efficiencies in utilization of labor, consumption of fuel, utilization of system intercommunication, and otherwise. As a result there has been a definite, nationwide deterioration in investors' regard for the Company's common stock, which has failed to progress as compared to the stock of representative utilities throughout the country and as compared to those of the seven surrounding public utilities in Maryland, Delaware, Pennsylvania, the District of Columbia, and Virginia. Informed and experienced investors often had sold or not added to their holdings of the Company's common stock because they could do better in other utilities. Despite this history of inadequate earnings and lessened regard by the investors, the Company must spend some $270,000,000 in the next five years to provide service for those who will call for it. This could not be done reasonably and practicably unless adequate earnings were authorized, and the Company proved it could translate authorization into realization and materially improve its earnings per share.

The average gross additions to property used and useful in the public service for each of the last five years (1953-1957) was $38,000,000. The Company proposed to spend $45,000,-000 gross in 1958. In 1954 the Commission had set a new rate base, using book value less depreciation, with working capital eliminated and material and supplies and work under construction added. A comparison of the rate base at the end

of June, 1956, and that of each subsequent month of the year, with that a year earlier, showed an average yearly increase in rate base of $31,600,000. A similar comparison using the end of each of the months in 1957 showed an average yearly increase in rate base of $28,500,000. The rate base of approximately $391,655,000 as of December 31, 1957, was 2% above the bare depreciated cost of the property. There was expert testimony that the minimum fair value of the Company's property as of December 31, 1957, was $575,000,000.

After Judge Carter had handed down his opinion, but before the order appealed from of April 1, 1959, was issued, the Company, relying on Code (1957), Art. 78, Sec. 96 ("Any party may introduce new evidence on judicial review"), proffered testimony: (a) that during 1958 construction expenditures were made at a substantially uniform rate and up to June 30, 1958, (eleven days before the Commission's order of July 11, 1958), it had spent $21,553,238; (b) that during 1958 the Company expended $39,946,936 on new utility plant; (c) that the result was a 1958 year end rate base, without projection and calculated strictly in accordance with the Commission's 1954 formula, of $418,581,854, which is only 1.2% less than the projected rate base determined by the Commission in its order of July 11, 1958, and the rate of return in fact earned in 1958 on the actual rate base was within three one-hundredths of 1% of what the Company testified before the Commission it would be; (d) that the Company's rate base at June 30, 1958, determined without projection was $405,-937,963; (e) and that as has been true for the past thirty-five years the actual year end rate base for 1957 and 1958 included "construction work in progress"—$17,925,399 for 1957 and $26,587,036 for 1958. Judge Carter refused to consider the proffered testimony on the ground that it was immaterial to the only issue presented as he saw it—whether the rate base set by the Commission was illegal to the extent of $32,200,000.

In deciding that the rate base was illegal, the trial judge gave the words of Code (1957), Art. 78, Secs. 68 and 69, a literal, rigid and completely inelastic meaning. Section 68 says that the Commission "shall have the power to determine

just and reasonable rates of public service companies". Section 69 provides that " 'Just and reasonable rates' means rates which are not in violation of any of the provisions of this article * * * yielding * * * a reasonable return upon the fair value of the company's property used and useful in rendering service to the public." It was the view of the lower court that unless property was actually in service at the time of the Company's application for rate revision, it was not "used and useful in rendering service to the public." This narrow construction of the statute is unwarranted. Section 69 came into the law expressly in 1955 when the legislature adopted the recommendation of the Commission to Revise and Recodify the Laws Concerning the Public Service Commission. The committee's report of February 28, 1955, said: "Changes in phraseology of the present law are not intended to effect any change in meaning unless such intention is specifically stated in the explanatory notes" or "clear language inescapably compels a contrary conclusion." The explanatory note to what is now Sec. 69 of Art. 78 says in part: "The text sets out explicitly and in its logical place in the statute the fundamental rate making procedure, which it has been necessary for courts to imply, under the present law, from sections on 'valuation' and 'temporary rates.' " The legislature passed the section as the revision Commission proposed it.

In *Hagerstown v. Public Service Commission*, 217 Md. 101, 111-112, we noted that the provisions of Sec. 69 had been implicit in the law of Maryland before 1955 and said: "There is no indication that what is now Section 69 of Art. 78 and the closely related Sections 68 and 72 were intended to establish any new or revoluntionary method of rate-making." (Section 72 authorizes the Commission to ascertain at any time "the fair value of the property of any public service company used and useful in rendering service to the public".)

The meaning and the concept of the words "used and useful in rendering service to the public" have been held to have a certain elasticity since the phrase first came into use. Although monies used to construct additions to plant do not actually and immediately render service to the public, interest on such monies during the period of construction long has been capi-

talized and added to the rate base with approval of the courts and regulatory commissions. Hartman, *Fair Value* (1920) points out that funds employed in construction draw no return prior to the date of operation and that the interest foregone during the construction period is a necessary and legitimate part of the construction expense, and at page 168 says: "Such charges represent an actual investment, used and useful in the utility business. * * * and the State Commissions, without exception, hold that within reason interest during construction is properly included in the valuation."

The cases make it clear that usually there will be included as part of the rate base either capitalization of interest during construction or the value of plant under construction, but not both since this would mean a duplication. In *New England Tel. and Tel. Co. v. State* (N. H.), 64 A. 2d 9, 18, 19, the Commission in setting net book cost investment had excluded plant under construction. On appeal the Court said: "The issue presented is essentially one of fact for the commission's determination. * * * It also appeared that interest upon unfinished construction is capitalized by the company. In this situation, by almost universal rule, exclusion from the rate base is held proper to prevent a double return." See also *Northern States Power Co. v. Public Service Commission* (N. D.), 13 N. W. 2d 779; *Ohio Bell Telephone Co. v. Public Utilities Commission* (Ohio), 3 N. E. 2d 475, 493; *Petition of Central Vermont Public Service Corp.* (Vt.), 71 A. 2d 576, 580; *Petition of New England Tel. & Tel. Co.* (Vt.), 66 A. 2d 135, 142.

Another established usage which shows that the phrase "used and useful in rendering service to the public" historically does not rigidly and literally bind the rate setting body to that which has occurred at the time of the hearing is the inclusion in the rate base of property acquired and held in anticipation of reasonable future needs but not actually in service. Such property may be included in the rate base if the regulatory body determines that its acquisition was reasonably necessary and its use may be anticipated with reasonable precision, or if, it has sometimes been held, the property is likely to be placed in service within the period for which the rates are fixed. *Pacific*

*Tel. & Tel. Co. v. Wallace* (Ore.), 75 P. 2d 942, 952; *Southern Bell Tel. & Tel. Co. v. Railroad Comm. of S. C.*, 5 F. 2d 77, 94-95 (E.D.S.C.); *Indianapolis Water Co. v. McCart*, 89 F. 2d 522 (7th Cir.); *New England Tel. & Tel. Co. v. State*, *supra* (at page 19 of 64 A. 2d); *Wisconsin Telephone Co. v. Public Service Commission* (Wis.), 287 N. W. 122, 156-157. In *Columbus Gas Co. v. Public Utilities Commission*, 292 U. S. 398, 406, 78 L. Ed. 1327, 1332, Mr. Justice Cardozo made an observation which has been often referred to or quoted. He said: "There will be no need in the computation of the rate base to include the market or the book value of fields not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital," and added: "The arrival of that time * * * must be determined for every producer by the triers of the facts in the light of all the circumstances."

Conditions in recent years have persuaded regulatory agencies throughout the country to include in the rate base, as used and useful in the public service, property estimated to be in service by the end of the test year. This is on the same theory that supports inclusion in the rate base of the amount of the capitalization of interest during construction or the value of property under construction, or property owned but not in service. The conditions that have prompted this practice are inflation, attrition and regulatory lag. Since the end of the last World War, rates designed to give a certain return did so only for a short period and then became inadequate as rising prices, wages and taxes took their toll. "Attrition" is the term applied to the reduction in the rate of earnings resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates from the company's point of view. When plant must expand rapidly and substantially to meet demands for service, as is now true in the case of the Company, and generally, the diminishing effect upon the overall rate of return is great. The Company added $26,000,000 net to plant in 1957 and obtained only a 1.6% return on this investment. Regulatory lag is the delay in securing relief after its need has become known. Inevitably, months pass while

the regulatory body determines the action to be taken, and during this period the utility often must operate with an inadequate rate of return, as the Company did in the first six months of 1958. A discussion of these matters is found in Nichols, *Ruling Principles of Utility Regulation* (1955) under the headings "Inflation and Rising Prices", 153 *et seq.* and "Attrition and Regulatory Lag", 158 *et seq.*

In the case before us the Commission was fully aware of these problems. It could have attempted to meet them in various ways. It could have increased the otherwise allowable rate of return. It could have determined fair value of plant to be more nearly equivalent to current reproduction cost less depreciation. It could have increased net historical cost rate base by increments which reflected and compensated for the added relative costs of recent expensive plant expansions. The Commission chose, as an appropriate method of rate making under present conditions, to use as a test year the calendar year in which the hearing was held, rather than a twelve months' period which had already expired, to use a year end, rather than an average rate base, to include in that rate base the $32,200,000 of net additions to plant that the evidence showed would be in service by the end of the test year, and to use estimated income and expenses of the test year to determine the proper rate of return.

Our inquiry is limited to finding whether there was illegality or unreasonableness in the Commission's action—when that inquiry is finished, judicial scrutiny ends and the judicial function in the rate making process is over. Code (1957), Art. 78, Sec. 97; *Public Service Commission v. Byron,* 153 Md. 464; *Public Service Commission v. United Rys. & Elec. Co.,* 155 Md. 572; *Bosley v. Quigley,* 189 Md. 493, 506; *Public Service Commission v. Baltimore Transit Co.,* 207 Md. 524.

Rate making necessarily is predictive since it is the legislative process of making a rule for the future. *Gregg v. Public Service Commission,* 121 Md. 1, 28; *McCardle v. Indianapolis Water Co.,* 272 U. S. 400, 408-409, 71 L. Ed. 316, 324 ("It must be determined whether the rates complained of are yielding and will yield, * * * a sum sufficient to constitute just compensation for the use of the property employed to

furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation and for a reasonable time in the immédiate future"); *Chesapeake & Potomac Tel. Co. v. Public Service Comm.,* 201 Md. 170, 180, quoting from *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 442, 47 L. Ed. 892 (" * * * 'what the company is entitled to demand, * * * is a fair return upon the reasonable value of the property at the time it is being used for the public.' "). This being so, the courts have recognized, as we have noted, that the rate of return of tomorrow need not be fixed solely on the facts of today but that reasonable estimates of what tomorrow may bring also may be relied on. One of these estimates permissibly can be the net addition to plant that will come into service by the end of the test year. By July 11th of the test year 1958, there was already in service some $14,000,000 net additions to the rate base as it stood on December 31, 1957, and the value of property actually in service was growing with substantial uniformity month by month. The Company had already borrowed $30,000,000 to finance expansion in April of 1958 when the testimony was being taken. Certainly the Commission reasonably and properly could determine that the time of use of the net additions to plant in 1958 was, in the words of Justice Cardozo, "so near that they may be said, at least by analogy, to have the quality of working capital."

There was nothing novel in what the Commission did. In February, 1958, it adopted a rate base projected more than four months in the proceeding titled *Re C. & P. Telephone Co.,* 22 PUR 3d 321. In *Re C. & P. Telephone Company of Baltimore City,* 5 PUR 3d 161, the Commission on September 1, 1954, adopted a 1954 year end rate base, a projection ten months from the latest record rate base figures. It took similar actions in earlier years.[1]  Commissions in many other states

---

1. *Re Conowingo Power Co.,* 10 PUR NS 353 (three months' projection); *Re Potomac Edison Co.,* 7 PUR NS 135 (six months' projection); *Re Eastern Shore Gas & Electric Co. of Maryland,* PUR 1929E 244 (four months' projection); *Mayor of Hyattsville v. Washington Suburban Gas Co.,* PUR 1929E·4.

have done likewise, as has the Federal Power Commission.[2]

The courts have said that what the commissions have done in this respect is proper and permissible. In *New Jersey v. New Jersey Bell Telephone Company* (N.J.), 152 A. 2d 35, the Board of Public Utility Commissioners found a rate base made up of historical plant as of December 31, 1957, plus $25,500,000, which it took as the average 1958 increase in net investment. The Court remanded the case to the Board because it found the record would not factually substantiate the inclusion of the 1958 net additions to plant, and said:

> "The question on this appeal is whether it was erroneous for the Board to include in the rate base calculated upon the depreciated original cost of plant, i. e., book value, as of December 31, 1957, the sum of 25½ million dollars representing the average 1958 increase in net investment, in order to arrive at a fair value of the Company's property. * * *
>
> "Appellants argue that the inclusion of a future addition to property in determining the current rate base constitutes legal error. It is urged that the Board

2. California—*Re Citizens Utilities Co. of Calif.,* 4 PUR 3d 97, 102 (rate base projected 6 months); Connecticut—*Re Housatonic Public Service Co.,* 22 PUR 3d 1 (rate base projected 3 months); District of Columbia—*Re C. & P. Tel. Co.,* 6 PUR 3d 222 (rate base projected 5 months); Georgia—*Re Southern Bell Tel. & Tel. Co.,* 91 PUR NS 97 (rate base projected 11 months); Kansas—*Re Southwestern Bell Tel. Co.,* 93 PUR NS 161 (rate base projected 11 months); Missouri—*Re Southwestern Bell Tel. Co.,* 92 PUR NS 481 (rate base projected 11½ months); New Jersey—*Re Plainfield-Union Water Co.,* 3 PUR 3d 83, 88 ($1,000,000 projection added to $6,257,900 rate base. Projection for 9 months); New Mexico—*Re Mountain States Tel. & Tel.,* 8 PUR 3d 176 (rate base projected 7 months); New York—*Re New York Telephone Co.,* 84 PUR NS 267 (rate base projected 8 months); Utah—*Re Bear River Telephone Co.,* 12 PUR 3d 153 (rate base projected 13 months); Wisconsin—*Re Wis. Tel. Co.,* 23 PUR 3d 388 (rate base projected 8½ months); Wyoming—*Re Mountain States Tel. & Tel. Co.,* 89 PUR NS 341 (rate base projected 10 months); Federal Power Commission—*Re South Carolina Generating Co.,* 15 PUR 3d 289, rehrg. 17 PUR 3d 95 (rate base projected 2 months).

may not depart from the figure of the test year.

"We find this view of the Board's powers to be too circumscribed. * * *

"If the average increase in net investment for the year following the test year appears from the evidence to be rationally and reasonably related to the problem of inflation or attrition, there exists no legal obstacle to its utilization."

To the same effect is *New England Tel. & Tel. Co. v. Department of Pub. Utilities* (Mass.), 121 N. E. 2d 896, 906-907. In *Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Comm.,* 11 F. 2d 319, 323 (E. D. Mich.), the Court said: "Further it is obvious that in making a rate for a contemplated period of, say, 3 years, there should be added to the rate base a suitable estimate for the reasonably certain additions to the plant during the period, * * *." The district judge in *Columbus Gas & Fuel Co. v. City of Columbus,* 17 F. 2d 630, 636 (S. D. Ohio), made the same observation. He said (in 1927): "It may be somewhat of a departure from customary commission methods of handling such a problem, but the court is of the opinion that an allowance should be made, to go into the so-called rate base, for extensions which will probably be called for during the life of the ordinance, a period of four years."

In *Petition of New England Tel. & Tel. Co.* (Vt.), *supra,* 66 A. 2d 135, 142, the Commission in its order of May, 1948, effective December 1, 1947, said it would not "speculate" on what the average net investment would be as of December 31, 1948. The Court felt that from the evidence "a fair probable estimate could have been made" and remanded the case, and, speaking directly of plant under construction but citing as authority cases dealing with estimated net additions to plant, said: "A public utility company should expand in order to meet the demand of the people for additional service. Construction to meet such demand cannot be started one day and completed the next. Such construction when reasonable should be encouraged. If at the time of a rate hearing it should appear from the evidence that certain property under construc-

tion will be available for use in the way of furnishing service during the period in which the rates in question will be in effect, such property should be included in the rate base."

The Court, in *Petition of Central Vermont Public Service Corp.* (Vt.), *supra,* 71 A. 2d 576, approved a test year which had expired—May 1, 1948, to April 30, 1949, rather than one ending April 30, 1950, as the utility urged—although it noted: "There is no question, on the other hand, but that there is authority supporting in general the view taken by the petitioner." The Court also found that the Commission did not err in failing to include future additions to plant in view of "the situation in hand", but said of the utility's contention that extensions and betterments to be begun, completed and put in service during the year ending April 30, 1950 (the year following the test year), should be included in the rate base: "If the Commission had adopted a test year period coinciding with that noted, and if the estimated revenues to be produced from such future additions had also been included as the balancing factor, there would be merit to the contention. But with the selection of a test year ending April 30, 1949, these items were not germane." .

The Maryland Public Service Commission, in the case before us, did, as to future additions and estimated revenues, just what the Vermont Court said would give merit to the inclusion of proposed net additions to the rate base. In *Hagerstown v. Public Service Commission, supra,* 217 Md. 101, 106, 107, the lower court remanded the case to the Commission for the inclusion in the rate base of "any projects so substantially completed that the final cost thereof can be determined." We noted that the Commission, on remand, was ordered to take into consideration "the cost of certain projects (useful to county consumers) actually or substantially completed," and affirmed the Commission's rate order.

The appellees, at the argument, made the brief, general and undocumented claim that there would be duplication in the rate base if the value of both work under construction and that of future net additions were included. The Company in its rebuttal argument made an equally general denial that this was so. If the value of the same property were included twice,

in whole or in part, once as work under construction and again as an estimated future addition, manifestly there would be error. We cannot tell from the record if such duplication did occur. Under Code (1957), Art. 78, Sec. 97, and the cases, the order of the Commission is prima facie correct and the burden is on those who seek to set it aside on appeal to show by clear and satisfactory evidence that there is illegality or unreasonableness. *Montgomery Co. v. Public Service Comm.,* 203 Md. 79, 84. *Baltimore Transit Co. v. Public Service Comm.,* 206 Md. 533, 558.

The protestants below, the appellees here, did not show duplication. They concede that the Company does not capitalize interest during construction and that the inclusion in the rate base of work under construction is proper and lawful. They do not challenge the accuracy of the Company's proffered testimony before Judge Carter, only its materiality and relevance. We think the testimony should have been considered as a check or test of the validity of the Commission's action, if for no other reason. Experience and not prophecy is the final test. *Pennsylvania R. R. Co. v. Public Service Comm.,* 126 Md. 59, 80-81; *Chesapeake & Potomac Tel. Co. v. Public Service Commission, supra,* 201 Md. 170, 186. In *Baltimore Transit Co. v. Public Service Comm., supra,* 206 Md. 533, 553, there was noted, with at least implicit approval, the check the lower court made on the validity of the Commission's action, by considering a rate base, furnished by the Commission without objection from either side, as of months later than the time the base was set by the Commission, to see if actual income gave a proper return on that recent base. In the instant case, the proffered evidence was that the June 30, 1958, rate base, without projection, was $405,937,963, that of December 31, 1958, without projection was $418,581,854 (within 1.2% of the projected rate base adopted by the Commission), and that the lower than anticipated actual 1958 revenues measured against the actual 1958 year end rate base gave a rate of return that was within three one-hundredths of 1% of the rate of return the Company estimated before the Commission it would earn on the rate base adopted by the Commission.

There has been no showing that the order of the Commission of July 11, 1958, was illegal or unreasonable. This conclusion dispenses with any need to review the propriety of Judge Carter's order to refund excessive rates.

> *Order appealed from reversed, with costs; petition for review dismissed, and order of Public Service Commission of Maryland, dated July 11, 1958, affirmed.*