Public Utilities Commission
No. 6518

NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY

v.

STATE OF NEW HAMPSHIRE

March 20, 1973

*McLane, Carleton, Graf, Greene & Brown* and *G. Peter Guenther* (*Mr. Kenneth F. Graf* orally) for the company.

*Cleveland, Waters, & Bass* and *George L. Manias* (*Mr. Warren E. Waters* orally) for the public utilities commission.

*George Charles Bruno,* director, and *Richard Cotton,* attorney, New Hampshire Legal Assistance (*Mr. Cotton* orally), for Operation Low-Income People.

*Harlington Wood, Jr.,* United States Assistant Attorney General, *William B. Cullimore,* United States Attorney for New Hampshire, *William E. Nelson* and *Bruce G. Forrest,* attorneys, Department of Justice (*Mr. Forrest* orally), as amicus curiae for the United States.

LAMPRON, J.   Appeal under RSA 541:6, 7 from order No. 10,710 entered on August 24, 1972, by the public utilities commission as a result of an investigation under RSA 378:5 of a proposed tariff change filed by the company on August 6, 1971, to become effective on September 5, 1971. This tariff constituted a 22% composite increase over existing rates and was designed to produce an annual gross revenue increase of $9,950,000. On August 26, 1971, the commission suspended the taking effect of this proposed schedule of rates pending investigation and decision thereon. RSA 378:6.

Following hearings, the commission made certain findings and on August 24, 1972, entered an order authorizing an annual increase in gross revenue of $5,245,000, about 11.6%

over the revenue from existing rates, and ordered the company to amend its proposed tariff accordingly. On September 12, 1972, the company filed a motion for rehearing setting forth the grounds on which it claimed the decision of the commission was unlawful and unreasonable. RSA 541:3, 4. Certain exhibits in support were filed therewith. At the same time the company sought approval of a new tariff designed to produce the annual increase in revenue granted by the commission. Its motion for rehearing was denied, but the commission granted the company authority to file the new tariff to become effective on or after September 20, 1972. The company on October 11, 1972, filed its appeal with this court which was heard on January 16, 1973. A supplemental hearing on a motion relating thereto was held on February 8, 1973.

In arriving at its order the commission adopted as the test period the calendar year 1971 with adjustments. It used an average net intrastate rate base of $127,245,000; a capital structure of 51% fixed charge capital and 49% common equity, a cost of debt of 6.1%, a cost of preferred stock of 8%, a current cost of equity of 11%, and arrived at a fair rate of return of 8.6%. This required a revenue increase of $5,245,000 annually.

Without conceding its claim that many of the determinations made by the commission constituted errors of law, or were unjust or unreasonable, the company has chosen to pursue two main issues on this appeal which are stated in its brief to be the following: "The first, is whether the Commission, by ignoring the clear evidence that the Company would suffer attrition in its rate of return in the future, has approved rates which will deny the Company the opportunity to earn, for a reasonable period in the future, a fair return. The second is whether the Commission's total and uncritical adoption of the proposals of Staff Witness Kosh, and complete rejection of the evidence offered by three witnesses for the Company, was improper and led the Commission to find a rate of return which does not satisfy the Constitutional and statutory requirements of fairness and reasonableness."

RSA 378:7 imposes on the commission the duty to determine the just and reasonable rates to be charged by a public

utility for the services it renders. In making that determination, the commission must ensure that the public will not pay higher rates than are required while insuring that the rates established will yield not less than a reasonable return on the cost of the utility property used and useful in the public service. *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 232, 183 A.2d 237, 240 (1962); RSA 378:27, 28.

Rate-making cannot be reduced to an exact science by which a mathematically precise rate of return can be produced by a competently programmed computer. Rather, the proper rate of return is a matter for the judgment of the commission based upon the evidence before it with adequate findings upon which the validity of its orders can be determined. *New England Tel. & Tel. Co. v. State,* 95 N.H. 353, 359, 64 A.2d 9, 15 (1949); *Grafton etc. Co. v. State,* 77 N.H. 490, 93 A. 1028 (1915).

The commission's orders, however, must conform to certain well-established constitutional requirements. "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties." *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n,* 262 U.S. 679, 692, 67 L. Ed. 1176, 1182-83, 43 S. Ct. 675, 679 (1923). "While it is true that an attractive return to the investor is not necessarily just to the consumer . . ., a balancing of the interests of both investor and consumer requires a return which will enable the utility to maintain its credit and attract the necessary capital to meet increased demands for improvement and extension of its services." *Chicopee Mfg. Co. v. Company,* 98 N.H. 5, 11, 93 A.2d 820, 825 (1953); *accord, Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281 (1944); *Colorado Interstate Co. v. Federal Power Comm'n,* 324 U.S. 581, 89 L. Ed. 1206, 65 S. Ct. 829 (1944).

Because of the need to establish a fixed period in which to make the necessary calculations, a test year already expired is used by the commission to fix the rates under which the

utility will operate for some time in the future. This necessarily imposes on the commission the obligation to fix a rate of return which will meet the constitutional standards not only at the time its order is made but for a reasonable period of time thereafter. *Chicopee Mfg. Co. v. Company,* 98 N.H. 5, 11, 93 A.2d 820, 825 (1953); *State v. New Jersey Bell Tel. Co.,* 30 N.J. 16, 31, 152 A.2d 35, 43-44 (1959); *New England Tel. & Tel. Co. v. Kennelly,* 78 R.I. 211, 80 A.2d 891 (1951). This is recognized by RSA 378:7 which provides that the commission shall determine and fix a just and reasonable rate "thereafter to be observed" by the utility and imposes on it no obligation to again investigate a rate matter within a period of two years.

Such "use of the historical test year in the traditional rate-making process assumes that actual results for some past period of operations will be sufficiently representative of the future to provide a reliable testing vehicle for the proposed rates." Note, *The Use of the Future Test Year in Utility Rate-Making,* 52 B.U.L. Rev. 791, 794 (1972). Witness Bolster, called by the commission, however, testified: "Of course we know that under actual conditions, a utility's operations in the future will usually be at a different level from the test year. Usually a utility's service requirements are growing, and its investment, revenues, and expenses can generally be expected to increase as the service grows. But as long as revenues and costs remain in generally the same relative position as the test year, future costs will be covered."

However, if unprecedented demands for goods and services at increasing costs upset the balance between revenues, investments and expenses, the assumption that future results will approximate those of the past is not realized in fact. The result is attrition. Nichols, Ruling Principles of Utility Regulation-Rate of Return 134, 158, 165 (1955); *see New England Tel. & Tel. Co. v. Department of Pub. Util.,* 331 Mass. 604, 622, 121 N.E.2d 896, 906 (1954); *Baltimore Gas and Elec. Co. v. McQuaid,* 220 Md. 373, 152 A.2d 825 (1959); *New England Tel. & Tel. Co. v. Department of Pub. Util.,* 275 N.E.2d 493, 499, 500 (Mass. 1971).

Attrition has been defined by numerous courts, commissions and text writers. *New England Tel. & Tel. Co. v. Department*

*of Pub. Util., supra; In re Pub. Serv. Co.,* 35 N.H.P.U.C. 13, 14 (1953); Nichols & Welch, Ruling Principles of Utility Regulation-Rate of Return 55 (Supp. A. 1964). Witness Bolster defined attrition as follows: "an erosion in earning power of a revenue-producing investment. This erosion is a complex phenomenon, the result of operating expenses or plant investment, or both, increasing more rapidly than revenues. If attrition occurs, the result would be that the rate of return realized in the future would be below that which rates were designed to produce." This effect is apt to occur in a period of comparatively high construction costs when "'new plant is being added which . . . is relatively expensive per telephone station. As the high cost plant comes into service, it tends to increase the applicable rate base at a more rapid pace than the resultant earnings, and the rate of return decreases accordingly.'" *New England Tel. & Tel. Co. v. Department of Pub. Util.,* 331 Mass. 604, 622, 121 N.E.2d 896, 906 (1954).

If the existence of attrition can be established by the company the commission should evaluate the impact of this factor on the earnings of the utility and make an appropriate allowance for it. *In re Public Serv. Co., supra; In re New England Tel. & Tel. Co.,* 39 N.H. P.U.C. 284, 291 (1957). *See also New England Tel. & Tel. Co. v. Department of Pub. Util.,* 275 N.E.2d 493, 500 (Mass. 1971). The methods generally used to offset attrition are: (1) an increase in the otherwise allowable rate of return (*In re Hampton Water Works Co.,* 49 N.H.P.U.C. 323 (1967); *In re Hudson Water Co.,* 49 N.H.P.U.C. 50 (1967)); (2) use of a year-end rate base instead of the average test year rate base (*In re Pub. Serv. Co.,* 35 N.H.P.U.C. 13, 14-15 (1953); *see Chicopee Mfg. Co. v. Public Serv. Co.,* 98 N.H. 5, 18, 93 A.2d 820, 828-29 (1953)); (3) a combination of the previous two methods. *In re Chesapeake & Potomac Tel. Co.,* 21 P.U.R.3d 239 (Va. 1957).

The last general rate increase granted the company was based on a test year ending March 31, 1957. There was evidence that by the end of the December 31, 1971 test year used in the present proceedings the company's net investment had quadrupled since 1957, while its intrastate revenues, expenses, and taxes had all approximately tripled. There was further evidence that in the growth experienced by the

company until about 1966 these three essential elements, that is, investment, revenues and expenses had been in approximate balance. This was due in part to the relative stability in prices and to substantial reduction in operating expenses due to improved methods of rendering service.

However, there was also evidence that from 1966 to 1971 expenses increased 69%, investment grew 78.3% and revenues increased 58.1%. This resulted in a decline of the company's rate of return on its intrastate investment from 7.29% in 1966 to 6.45% in 1971, including the revenues generated by partial rate increases granted in 1969 and 1970. If these were eliminated, the 1971 rate of return would have been about 5.5%. There was also evidence that the upward trend in annual construction expenditures would continue into 1972 and that much of the recent and proposed plant and service improvement would not generate additional revenues.

Witness Bolster agreed that for the period 1966-1971 both plant and expenses had been increasing more rapidly than revenues. "If these trends were to continue there is no doubt that attrition in the company's earnings would occur." However, in his opinion it was not "at all clear that this recent experience will persist in the future." His reasons were that the rate of inflation would lessen and that the rapid growth in company employment in recent years in relation to main telephones would subside "as technology gains are achieved, once the desired quality of service is reached." Company witnesses disputed these assertions. One of them testified that future expenses would increase because of wage rate increases already provided for in existing contracts and that certain improvements rendered necessary by increased usage would combine to produce a loss of revenue. It was his opinion that the relative trends which produce attrition in the past would likely continue in the foreseeable future.

The commission was not compelled to accept the opinion of any one witness or to rely upon the expert testimony presented by the company in preference to that offered by its own witnesses. *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 236, 183 A.2d 237, 243 (1962). The commission made no specific findings on whether or not attrition was a factor

to be considered in these proceedings. It did not adopt the use of a year-end rate base, urged by the company, which is one of the recognized methods of making allowance for attrition. *Baltimore Gas and Elec. Co. v. McQuaid,* 220 Md. 373, 381, 152 A.2d 825, 829 (1959). Nor is there any indication in the commission's findings that any of the other recognized adjustments for attrition previously mentioned are reflected in the rate of return of 8.6% fixed by the commission. *In re Hampton Water Works Co.,* 49 N.H.P.U.C. 323 (1967); *In re Chesapeake & Potomac Tel. Co.,* 21 P.U.R.3d 239 (Va. 1957).

Furthermore with its motion for rehearing to the commission, the company appended certain exhibits. These purported to show that actual earnings from operations for the six months ending June 30, 1972, with adjustments for the new rates granted and the 1972 wage increase, were substantially below the 8.6% rate of return established by the commission. "It is self-evident that the more nearly an order . . . comes to being based on contemporary data, the more nearly exact justice is done to the utility and the further away is another rate case." *In re New England Tel. & Tel. Co.,* 2 P.U.R.3d 464, 483 (Mass. Dep't of Pub. Util. 1953).

This court appreciates that lengthy investigative hearings and the use of a past test year to make computations necessarily resulted in a regulatory lag between the tariff filing by the company on August 6, 1971, and the ultimate commission orders thereon on August 24 and September 20, 1972. *Baltimore Gas and Elec. Co. v. McQuaid,* 220 Md. 373, 381, 152 A.2d 825, 829 (1959). This lag can further accentuate the effects of attrition. Nichols & Welch, Principles of Utility Regulation 55, 57 (Supp. A. 1964). We are also aware that there is need of a cut-off date for the receipt of information to enable the commission to make a decision. *State v. Hampton Water Works Co.,* 91 N.H. 278, 284, 18 A.2d 765, 769 (1941). However, in a case such as this where the company maintains that the return fixed by the commission will lead to an unconstitutional confiscation of its property, the commission must receive and consider recent information which might substantially affect that issue. *New York Tel. Co. v. Public Serv. Comm'n,* 29 N.Y.2d 164, 169-70, 272 N.E.2d 554, 556 (1971);

*Boston Gas Co. v. Department of Pub. Util.,* 269 N.E.2d 248, 257-59 (Mass. 1971); *New England Tel. & Tel. Co. v. Department of Pub. Util.,* 275 N.E.2d 493, 524 (Mass. 1971).

We therefore remand to the commission for consideration and determination the sole issue of whether attrition is a significant factor which has been or must be considered by the commission in arriving at a proper return for the company. The commission will indicate by findings whether attrition is such a factor; whether or not it will prevent the company from realizing for the present and for a reasonable time in the future the rate of return allowed by the commission; whether a revision must be made in the revenue requirements of the company to permit it to realize a fair rate of return on the cost of its property used and useful in the public service less accrued depreciation, and if so, what it should be and its nature. We presume that the purposes of this remand can be accomplished on the present record, the recent reports filed by the company with the commission, and such further evidence on the issue as may be pertinent. This will avoid the complicated, expensive and time-consuming procedure of an entirely new and full-fledged rate hearing. *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 241, 183 A.2d 237, 246 (1962).

This remand renders unnecessary a ruling upon the company's motion opposing consideration of a supplemental brief by counsel for Operation Low-Income People containing the company's October 1972 earnings statement recently filed with the commission.

The effect of the applicable rules and regulations of the Federal Price Commission upon the issues before this court was argued by counsel for the United States as amicus curiae. We consider the question with the full realization that neither the commission nor this court is the final arbiter in this realm. To the best of our knowledge the presently applicable criteria as to increases in rates for public utilities after January 10, 1973, are the following: "(a) The increase is cost-justified and does not reflect future inflationary expectations; (b) The increase is the minimum required to assure continued adequate and safe service or to provide for necessary expansion to meet future requirements; (c) The increase will achieve

the minimum rate of return needed to attract capital at reasonable costs and will not impair the credit of the public utility; and (d) The increase takes into account expected and obtainable productivity gains." 38 Fed. Reg. 1484 (1973).

The following conclusions seem clear to us. First, these rules are not intended to prohibit a commission from making allowance for attrition which has already occurred, in order to set a rate of return which will conform with the constitutional requirements of *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n,* 262 U.S. 679, 67 L. Ed. 1176, 43 S. Ct. 675 (1923); *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281 (1944); *Colorado Interstate Co. v. Federal Power Comm'n,* 324 U.S. 581, 89 L. Ed. 1206, 65 S. Ct. 829 (1945). Second, any attrition, caused by the fact that past inflation renders necessary that the investment in all replacement plant and all new plant be made at a much higher per unit cost than the plant in existence, is a "cost justified [increase] and does not reflect future inflationary expectations." 38 Fed. Reg. § 130.81 (Jan. 12, 1973).

The company's final argument is expressed in its brief as follows: "The Commission's improper and uncritical adoption of the proposals of staff witness Kosh and complete rejection of evidence offered by the company was unsupported by evidence or findings and led the Commission to find a rate of return which is less than fair and reasonable." The company has questioned, in a prior case, the acceptance by the commission of testimony developed by this same witness. *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 236, 183 A.2d 237, 243 (1962). The fact that expert witnesses, such as Kosh, are called by counsel for the commission to testify concerning facts which the commission is required to find has been characterized as "anomalous" by the court in *New England Tel. & Tel. Co. v. Department of Pub. Util.,* 275 N.E.2d 493, 513 (Mass. 1971).

However administrative hearings by their nature need not follow the strict rules of procedure or of evidence which prevail in court proceedings. *New Hampshire Milk Dealers' Ass'n v. Milk Control Board,* 107 N.H. 335, 340, 222 A.2d 194, 199 (1966); McCormick, Evidence § 349 (2d ed. 1972). In arriving at its conclusions, the commission can rely, in addition to

the testimony presented, on the exhibits, the records and reports required to be filed with it by the company, and on the commission's own expertise and that of its own staff. *Granite State Alarm Inc. v. New England Tel. & Tel. Co.,* 111 N.H. 235, 238, 279 A.2d 595, 597-98 (1971). Furthermore the commission is not compelled to accept the opinion evidence of any one witness or group of witnesses. Whether it should rely upon the expert testimony presented by staff witnesses in preference to that offered by the company is a matter for its judgment based upon the evidence presented. *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 236, 183 A.2d 237, 243 (1962); *Plymouth Fire District v. Water Pollution Comm'n,* 103 N.H. 169, 173, 167 A.2d 677, 679 (1961). The commission findings are to be deemed prima facie lawful and reasonable on appeal. RSA 541:13. No convincing reason has been advanced why it is improper for the commission to accept the opinion of a staff witness over that of company witnesses if there is a reasonable basis to do so.

The company agrees that in a determination of the cost of equity the ascertainment of the rate of return required by an investor involves the application of a large measure of judgment. It also admits that Kosh and company witness Hardenbergh differ on their approach to this requirement. It maintains, however, that Kosh's theory ignores a most important factor, that is, that the market value of the company stock was approximately equal to its book value. The company also maintains that the commission's rejection of the testimony of company witnesses Gilmore and Borts on cost of equity and a proper rate of return "was even more cavalier than its treatment of the testimony of Mr. Hardenbergh."

The commission, on the other hand, argues that the logical exposition made by Kosh of the principles on which cost of equity is to be determined was "unimpeachable" and properly adopted by the commission. It also maintains that Gilmore's unfamiliarity with the company's past performance and that of its parent as well as his assumptions rendered his conclusions unrealistic. The commission also maintains that Bort's calculations on the cost of debt were erroneous because he rejected the embedded cost of the company's debt. It also maintains that his determination of the cost

of equity by the inclusion of a risk premium was a method not in common use.

It would serve no useful purpose to extend this opinion with further details regarding the different approaches presented by the various witnesses. We hold that the company has failed to prove that the commission's conclusions on a fair rate of return must be set aside because it accepted the Kosh results instead of those presented by the company witnesses. *Granite State Alarm Inc. v. New England Tel. & Tel. Co.,* 111 N.H. 235, 239-40, 279 A.2d 595, 599 (1971).

For the purposes previously stated the order is

*Remanded.*

KENISON, C. J., did not participate in the consideration or decision of this case; the others concurred.